IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT

------------------------------------------------------x
                                     :

CARMEN VILLAGOMEZ           :        3:09 CV 1001 (JGM)
                                       :

v.                              :
                                       :

CATHOLIC CHARITIES, INC.     :        DATE: NOVEMBER 30, 2010
ARCHDIOCESE OF HARTFORD, ET AL.  :
------------------------------------------------------x

RULING ON MOTION FOR SUMMARY JUDGMENT

On June 23, 2009, plaintiff Carmen Villagomez commenced this action against

defendants Catholic Charities, Inc. - the Archdiocese of Hartford, Ana Malave-Ortiz,[1] and

Janet Freimuth. (Dkt. #1). Plaintiff asserts that defendants retaliated against her for taking

medical leave under the Family and Medical Leave Act, 29 U.S.C. §§ 2601-19 ["FMLA"], and

in doing so, inflicted severe emotional distress upon plaintiff in violation of Connecticut law.

(Id.). On August 19, 2009, defendants filed their answer with affirmative defenses. (Dkt.

#10). On May 13, 2010, the parties consented to this Magistrate Judge's jurisdiction (Dkt.

#19), and on August 6, 2010, defendants filed the pending Motion for Summary Judgment,

with brief, Local Rule 56(a)1 Statement ["Defendants' Statement"], affidavits and exhibits in

support. (Dkts. ##25-26; see Dkts. ##22-24).[2] On September 27, 2010, plaintiff filed her

[1]Defendant Malave-Ortiz is referred throughout the motion, briefs and exhibits before the
Court alternately as Ortiz or Malave-Ortiz. Every reference to this defendant in this Ruling will be
as "Malave-Ortiz."

[2]Attached to defendants' brief is a copy of case law; Defendants' Statement; affidavit of
Ana Malave-Ortiz, sworn to August 6, 2010 ["Malave-Ortiz Aff't"]; affidavit of Lois Nesci, sworn to
August 6, 2010 ["Nesci Aff't"]; excerpts from plaintiff's deposition, taken on February 12, 2010
["Plaintiff's Depo."], and excerpts from plaintiff's second deposition, taken on March 24, 2010
["Plaintiff's 2nd Depo."], attached to which are eleven exhibits: copy of grievance letter, dated July
16, 2007 ["Crissman Grievance Letter"](Exh. 1); copy of letter from Malave-Ortiz to plaintiff, dated
July 31, 2007 ["7/31/07 Letter"](Exh. 2)'; copy of plaintiff's Written Statement, dated July 31, 2007
["Plaintiff's 7/31/10 Statement"](Exh. 3); letter to plaintiff from Robyn Hawley, dated October 18,
2007 and copy of the investigation report ["10/18/07 Letter"](Exh. 4); copy of letter from Janet
Freimuth to plaintiff, dated October 14, 2008 ["10/14/08 Letter"](Exh. 5); copy of Certification of

brief in opposition, Local Rule 56(a)2 Statement ["Plaintiff's Statement"], affidavits and exhibits in support. (Dkt. #29; see Dkts. ##27-28).[3]  On October 14, 2010, defendants filed their reply brief (Dkt. #32; see Dkts. ##30-31), and six days later, plaintiff filed a surreply brief. (Dkt. #33).

For the reasons stated below, defendants' Motion for Summary Judgment (Dkt. #25) is granted.

## I. DISCUSSION

The standard for summary judgment is well established.  The moving party is entitled to summary judgment if it demonstrates that there is no genuine issue of material fact and that it is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c).  Upon motion, following adequate time for discovery, Rule 56(c) requires that summary judgment be entered against a party:

> who fails to make a showing sufficient to establish the existence of an
> element essential to that party's case, and on which that party will bear the
> burden of proof at trial.  In such a situation, there can be "no genuine issue
> as to any material fact," since a complete failure of proof concerning an
> essential element of the nonmoving party's case necessarily renders all other
> facts immaterial.  The moving party is "entitled to judgment as a matter of
> law" because the nonmoving party has failed to make a sufficient showing on
> an essential element of her case with respect to which she has the burden of

Health Status Memorandum, dated May 20, 2008 ["Health Status Memo"](Exh. 6); copy of FMLA provider statement, dated December 26, 2007 ["FMLA Provider Statement"](Exh. 7); copy of medical note, dated December 26, 2007 ["Medical Note"](Exh. 8); copy of grievance letter from Rebecca Nazario, dated September 29, 2008 ["Nazario Letter"](Exh. 9); copy of letter to plaintiff from Malave-Ortiz, dated October 6, 2008 ["10/6/08 Letter"](Exh. 10); copy of plaintiff's response to Interrogatory No. 8 ["Plaintiff's Response to Interr. No. 8"](Exh. 11).

[3]Attached to plaintiff's brief is Plaintiff's Statement, and the following exhibits: complete copy of Plaintiff's Responses to Defendants' Interrogatories and Requests for Production, dated October 30, 2009 ["Plaintiff's Interr. Responses"](Exh. A); additional copies of excerpts from Plaintiff's Depo. and excerpts from Plaintiff's 2nd Depo. (Exhs. B-C); affidavit of Bill DeCarlo, sworn to September 11, 2010 ["DeCarlo Aff't"](Exh. D); copy of Professional Growth Plans from 1997 through 2008 (Exh. E); and affidavit of Eduardo Zumaeta, sworn to September 23, 2010 ["Zumaeta Aff't"](Exh. F).

proof.

Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986).

This showing may be made by "pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any." FED. R. CIV. P. 56(c). "On summary judgment the inferences to be drawn from the underlying facts contained in the [the moving party's] materials must be viewed in the light most favorable to the party opposing the motion." Adickes v. S.H. Kress & Co., 398 U.S. 144, 158-59 (1970), quoting United States v. Diebold, Inc., 369 U.S. 654, 655 (1962). "If reasonable minds could differ as to the import of the evidence, . . . the moving party simply cannot obtain summary judgment." R.B. Ventures, Ltd. v. Shane, 112 F.3d 54, 59 (2d Cir. 1997)(citations & internal quotation marks omitted). Thus, the party moving for summary judgment must "carry its burden of showing the absence of any genuine issue of fact." Adickes, 398 U.S. at 153.

A. FACTUAL BACKGROUND[4]

Project APOYO was a bi-lingual, bi-cultural, community-based Latino Youth Offender Program based in New Haven, that offered management and intervention services to individuals prior to trial. (Defendants' Statement ¶ 1; Plaintiff's Statement ¶ 1; Malave-Ortiz Aff't ¶ 3). It was a small organization that had only ten or fewer employees, and the program closed permanently in the Summer of 2009. (Defendants' Statement ¶ 2; Plaintiff's Statement ¶ 2; Malave-Ortiz Aff't ¶ 3).[5] The program was designed to provide an alternative to incarceration for Latino youth who would otherwise have been behind bars, and to provide

---

[4]This factual summary is drawn from Defendants' Statement, Plaintiff's Statement, and their accompanying affidavits, deposition transcripts, and exhibits.

[5]In 2008, defendant Catholic Charities, Inc. had approximately 580 employees, which number has been reduced to approximately 510 employees at the present. (Malave-Ortiz Aff't ¶ 2). See also (Complaint ¶ 3)(defendant Catholic Charities has more than fifty employees)..

support services for Latino probationers; Project APOYO sought to change the criminal behavior of offenders by fostering positive independent lifestyles. (Defendants' Statement ¶ 1; Plaintiff's Statement ¶ 1; Malave-Ortiz Aff't ¶ 3).

Plaintiff was born in Ecuador in 1955 and she moved to the United States for the first time when she was seventeen, when she then attended and graduated from Stamford High School in 1974. (Defendants' Statement ¶ 3; Plaintiff's Statement ¶ 3; Plaintiff's Depo. at 4-5). Thereafter, she moved back to Ecuador, where she went to college, and she returned to the United States permanently in 1985. (Id.).

Plaintiff began her employment at Catholic Charities in 1997 as a case manager for Project APOYO, where she was employed until February 2009. (Defendants' Statement ¶ 4; Plaintiff's Statement ¶ 4; Malave-Ortiz Aff't ¶ 4).[6] After approximately one and one-half years with Project APOYO as a case manager, plaintiff became a site coordinator, a job she held until she left Project APOYO. (Defendants' Statement ¶ 5; Plaintiff's Statement ¶ 5; Malave-Ortiz Aff't ¶ 4; Plaintiff's Depo. at 20). Plaintiff always thought that the job required a lot of work and commitment, and she treated the Project like it was "her baby," requiring her to perform extra work. (Defendants' Statement ¶ 6; Plaintiff's Statement ¶ 6; Plaintiff's Depo. at 21-22).

Without limiting herself in terms of a time frame, plaintiff felt that she "went through hell . . . with all the ups and downs of running a program, with all the limitations, their frustrations, with anything that you encounter on a daily basis having to deal with staff members, . . . directors, . . . clients, . . . referral sources, . . . with everything and anything

---

[6]According to defendants, plaintiff remained an employee until she failed to return from a second FMLA leave in February 2009. (Defendants' Statement ¶ 4). According to plaintiff, defendant did not plan to have plaintiff return from FMLA leave in February 2009. (Plaintiff's Statement ¶ 4).

. . . ." (Defendants' Statement ¶ 7; Plaintiff's Statement ¶ 7; Plaintiff's Depo. at 22). Plaintiff felt that being a middle level manager was stressful, with her having to periodically deal with what she considered to be disloyal staff members. (Defendants' Statement ¶ 8; Plaintiff's Statement ¶ 81; Plaintiff's Depo. at 69-70). Plaintiff was particularly distressed when her first supervisor left and was replaced by Wally Garcia on February 28, 2007; she felt "protected" and "supported" by her first supervisor but did not feel that way with Garcia. (Id.; Malave-Ortiz Aff't ¶ 4). Plaintiff's work was generally satisfactory or better, and until 2007, no employee had ever filed a grievance against her. (Defendants' Statement ¶ 9; Plaintiff's Statement ¶ 9; Malave-Ortiz Aff't ¶ 4).

On July 16, 2007, Traci Crissman, a clinician at Project APOYO, wrote to Mark Augustine, the Director of Clinical Services and Crissman's direct supervisor, complaining about "incidents of inner-office hazing and unprofessional conduct which transpired at Catholic Charities Project APOYO" at plaintiff's direction. (Defendants' Statement ¶ 10; Plaintiff's Statement ¶ 10; Malave-Ortiz Aff't ¶ 5; Exh. 1, Crissman Grievance Letter). Crissman was not directly supervised by plaintiff regarding the quality of her work, as plaintiff did not have a clinical background and thus could not evaluate or supervise a clinician's professional work. (Defendants' Statement ¶ 10; Plaintiff's Statement ¶ 10; Malave-Ortiz Aff't ¶ 6). Crissman complained that three other employees "following [plaintiff's] directives, actively participated or developed new ways of treating me in ways in which I would consider malevolent and unprofessional." (Defendants' Statement ¶ 11; Plaintiff's Statement ¶ 11; Malave-Ortiz Aff't ¶ 7).[7]

---

[7]Plaintiff denies the truth of the grievance letter. (Plaintiff's Statement ¶ 11; DeCarlo Aff't ¶¶ 7-8). See note 8 infra.

After the complaint was received, Malave-Ortiz initiated an investigation on July 31, 2007, and sent plaintiff a letter informing her that an allegation has been made against her, an investigation would be conducted, and that she was to cease and desist from any type of behavior that could be considered inappropriate, unprofessional or retaliatory. (Defendants' Statement ¶ 12; Plaintiff's Statement ¶ 12; Malave-Ortiz Aff't ¶ 8; 7/31/07 Letter). At that time, defendant Catholic Charities did not provide plaintiff with the details or names of the persons involved. (Defendants' Statement ¶ 13; Plaintiff's Statement ¶ 13; Malave-Ortiz Aff't ¶ 9). That same day, plaintiff was interviewed, during which she was given details and an opportunity to provide a written statement, which she did. (Defendants' Statement ¶ 14; Plaintiff's Statement ¶ 14; Malave-Ortiz Aff't ¶ 10; Plaintiff's 7/31/07 Statement). Ultimately, after the investigation, it was determined that there was a pattern of unacceptable conduct, and in October, plaintiff was given a one day suspension. (Defendants' Statement ¶ 15; Plaintiff's Statement ¶ 15; Malave-Ortiz Aff't ¶ 11; 10/18/07 Letter).[8]

A little over a week later, plaintiff went out on leave. (Defendants' Statement ¶ 16; Plaintiff's Statement ¶ 16; Plaintiff's Depo. at 63). According to defendant, plaintiff said she went out on leave because of the stress of receiving the suspension letter and the resultant feeling of being unappreciated, while plaintiff contends that she went out on leave because she was suffering from "insomnia, lack of concentration and focus, crying often, anxious[ness], headaches, malaise, fatigue, worr[y] . . ., stomach pains, decrease[ ] [in] appetite, [and] lethargy." (Defendants' Statement ¶ 16; Plaintiff's Statement ¶ 16; Plaintiff's

---

[8]According to plaintiff, the investigation was based solely on the statement of one disgruntled and alienated employee. (Plaintiff's Statement ¶ 15; DeCarlo Aff't ¶ 8). See note 7 supra.

Depo. at 63; FMLA Provider Statement). Plaintiff returned from her FMLA leave in February 2008, after which, with one exception, she was never disciplined. (Defendants' Statement ¶¶ 17-18; Plaintiff's Statement ¶¶ 17-18; Malave-Ortiz Aff't ¶¶ 12-13).[9]

In May 2008, Lois Nesci, Chief of Operations, issued a memo reminding employees of the need for up to date medical certificates, including tuberculosis ["TB"] testing, which are required under Catholic Charities' policy and by some government grants; in the memo, Nesci indicated that the target date to have completed the certifications was October 1, 2008. (Defendants' Statement ¶¶ 20-21; Plaintiff's Statement ¶¶ 20-21; Malave-Ortiz Aff't ¶ 14; Nesci Aff't ¶¶ 3-5; Health Status Memo). In October 2008, central office records revealed that neither plaintiff, nor approximately thirty other employees,[10] had provided up to date certificates, so that plaintiff and the other employees received a letter, dated October 14, 2008 that had been drafted by central office, but was signed and sent out by regional directors. (Defendants' Statement ¶ 22; Plaintiff's Statement ¶ 22; 10/14/08 Letter). Plaintiff claims that she had given her health certificate to the New Haven office, not to the central office in Hartford, and she claims that as she has TB, she would test positive, and therefore was exempt from the TB testing requirement, a fact which plaintiff claims that the central office knew. (Defendants' Statement ¶ 23; Plaintiff's Statement ¶ 23; Plaintiff's 2nd Depo. at 86-90). Catholic Charities has a few employees who are TB positive, and such employees remind Catholic Charities of that fact and simply provide an undated health

---

[9]Plaintiff and defendants disagree as to the one exception to the issue of discipline: defendants contends that it was a letter plaintiff received from Freimuth, dated October 14, 2008, while plaintiff contends that there was a letter dated October 6, 2008 that was an exact replica of the letter dated July 31, 2007 which precipitated plaintiff's initial breakdown, causing her to take FMLA leave. (Defendants' Statement ¶ 19; 10/14/08 Letter; Plaintiff's Statement ¶ 19).

[10]See note 5 supra.

certificate. (Defendants' Statement ¶ 25; Plaintiff's Statement ¶ 25; Malave-Ortiz Aff't ¶ 16). Catholic Charities does not record such information and has no intention, for reasons of confidentiality and privacy, of creating a list. (Id.).

At the time of plaintiff's first leave, and thereafter, her immediate supervisor was Wally Garcia, and his supervisor was Robin Hawley, who was Director of Programs for the New Haven Region. (Defendants' Statement ¶ 26; Plaintiff's Statement ¶ 26; Malave-Ortiz Aff't ¶ 17). While plaintiff was on leave, Hawley was promoted, and Janet Freimuth, a new director of programs for the Region was hired. (Id.).

Plaintiff's doctor provided a medical certificate, dated November 13, 2007, in which he reported that plaintiff has "insomnia, lacks concentration and focus, [is] crying often, [is] anxious, [has] headaches, malaise, [and] fatigue, worries often, [and has] stomach pains, decreased appetite, [and] lethargy." (Defendants' Statement ¶ 33; Plaintiff's Statement ¶ 33; FMLA Provider Statement). On December 26, 2007, plaintiff's doctor gave plaintiff an "out of work" form that indicated that she could not return to work until February 4, 2008. (Defendants' Statement ¶ 34; Plaintiff's Statement ¶ 34; Defendants' Statement ¶ 15; Plaintiff's Statement ¶ 15; FMLA Provider Statement; Medical Note). When plaintiff returned to work from her first FMLA leave, she did not indicate to anyone, including Malave-Ortiz (beyond the November 13, 2007 medical certificate from her doctor), that she needed accommodations due to any emotional or mental handicap, and she did not tell her supervisor or Freimuth that she has any on-going problems. (Defendants' Statement ¶ 35; Plaintiff's Statement ¶ 35; Malave-Ortiz Aff't ¶ 20; Plaintiff's 2nd Depo. at 82-84).

When plaintiff returned from leave, her work schedule changed from a Tuesday to Saturday schedule to a Monday to Friday schedule. (Defendants' Statement ¶ 27; Plaintiff's

Statement ¶ 27; Malave-Ortiz Aff't ¶ 18; Nesci Aff't ¶ 7).[11]  As the Project dealt with a variety of government agencies, Freimuth felt that it was important to have the site coordinator there on Monday, when officials from various government agencies could very likely be on site, versus a Saturday, and it was thought to be good to have a supervisory presence on Mondays.  (Id.).  Plaintiff felt the change made it more difficult to get coverage if an employee who was scheduled to work on a Saturday was absent.  (Defendants' Statement ¶ 28; Plaintiff's Statement ¶ 28; Plaintiff's Depo. at 65-66).  Further, plaintiff felt that Freimuth did not know the program and wanted her there when court was in session. (Defendants' Statement ¶ 29; Plaintiff's Statement  ¶ 29; Plaintiff's Depo. at 65).  Plaintiff testified at her deposition that she was told by Freimuth "that everything was going to change . . . whoever left before because of stress or so, I don't care . . . ."  (Plaintiff's Depo. at 82; Zumaeta Aff't ¶ 5).[12]  Plaintiff never made a request to Freimuth to have the schedule changed back but eventually she did return to a Tuesday through Saturday schedule. (Defendants' Statement ¶ 31; Plaintiff's Statement  ¶ 31; Plaintiff's 2nd Depo. at 60).

On September 29, 2008, a second employee, Rebecca Nazario, filed a grievance in which she claimed that she was being unfairly treated and criticized by plaintiff.  (Defendants' Statement ¶ 37; Plaintiff's Statement  ¶ 37; Nazario Letter).  Nazario's claims were treated seriously, and as with the first grievance, Malave-Ortiz sent plaintiff a letter, dated October 6, 2008, informing her that a grievance had been filed, and that she was to cease and desist from any type of behavior that could be considered inappropriate, unprofessional, or

---

[11]According to plaintiff, there was an issue with having coverage on Saturdays.  (Plaintiff's Depo. at 64-67).

[12]Plaintiff testified that she did not talk to Garcia about whether this change in schedule was detrimental to her personally.  (Defendants' Statement ¶ 30; Plaintiff's Statement ¶ 30; Plaintiff's 2nd Depo. at 17-23).

retaliatory.  (Defendants' Statement ¶¶ 38-39; Plaintiff's Statement  ¶¶ 38-39; Malave-Ortiz Aff't ¶ 21; 10/6/08 Letter).

Before she could be interviewed, plaintiff went out on her second FMLA leave. (Defendants' Statement ¶ 40; Plaintiff's Statement  ¶ 40; Malave-Ortiz Aff't ¶ 21).  This was the only significant contact Malave-Ortiz had with plaintiff in the several months before plaintiff went out on her second FMLA leave.  (Defendants' Statement ¶ 41; Plaintiff's Statement ¶ 41; Malave-Ortiz Aff't ¶ 22; Plaintiff's 2nd Depo. at 74, 76).  Malave-Ortiz did not take any action toward plaintiff between the first and second  FMLA leaves that could be considered abusive.  (Id.).  Plaintiff claims that Freimuth was rude and short with her, along with being "very, very dry," and she claims that Freimuth told people to "tell me something bad about Carmen."  (Defendants' Statement ¶ 42; Plaintiff's Statement ¶ 42; Plaintiff's Depo. at 26, 78).  Plaintiff also complained that Freimuth never came to APOYO, and plaintiff felt that Freimuth was not professional, but was demanding, ordering, harassing and mean; according to plaintiff, the basis for her claim was Freimuth's body language and her being very short, very rigid; plaintiff felt very uncomfortable with her.  (Defendants' Statement ¶ 43; Plaintiff's Statement ¶ 43; Plaintiff's Depo. at 26; Plaintiff's  2nd Depo. at 16).  Plaintiff felt that Freimuth did not support her, understand the program, or realize how hectic it was. (Id.).

Plaintiff felt that Freimuth was not sensitive to the needs of Project APOYO and ignored it.  (Defendants' Statement ¶ 45; Plaintiff's Statement  ¶ 45; Plaintiff's Responses to Interr. No. 8). Plaintiff complained that neither her immediate boss, Garcia, nor Freimuth, came in for Coffee Klutch, or for an annual audit; she complained that "on these two important dates, it has been a tradition for our Directors to be present as a symbol of

'Support' for the site Coordinator."  (Id.).

B. FMLA RETALIATION

Plaintiff asserts that on or about October 29, 2007, plaintiff became severely and clinically depressed, causing her to become unable to work, and as a result, on November 13, 2007, plaintiff's health care provider issued to defendant Catholic Charities, an FMLA Certification as a result of which plaintiff was placed on FMLA leave.  (Complaint ¶ 12). Plaintiff alleges that when she returned to work in February 2008, she was subjected to a "pattern of gross abuse" by Freimuth and Malave-Ortiz in retaliation for her having taken leave; the abuse included a letter, dated October 6, 2008, in which plaintiff was informed that a grievance was made against her, and eight days later, plaintiff received a letter from Freimuth issuing her a "warning" for "violating Article 5 of the Employee Handbook." (Complaint ¶¶ 13-17).   Defendant moves for summary judgment on plaintiff's FMLA retaliation claim, in that plaintiff has not set forth a prima facie case of retaliation, plaintiff was not a victim of an adverse employment action, and any employer action taken towards her did not occur under circumstances giving rise to an inference of retaliatory intent.  (Dkt. #26, Brief at 15-20).

Section 2615(a)(1) of the FMLA states: "[i]t shall be unlawful for any employer to interfere with, restrain, or deny the exercise of or the attempts to exercise, any right provided under this subchapter."  29 U.S.C. § 2615(a)(1).  When evaluating a claim of retaliation under the FMLA, the burden-shifting framework established by the United States Supreme Court in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973), is applicable. Potenza v. City of New York, 365 F.3d 165, 168 (2d Cir. 2004).  In order to establish a prima facie case of retaliation under FMLA, plaintiff must establish that: "1) [s]he exercised rights

11

protected under the FMLA; 2) [s]he was qualified for [her] position; 3) [s]he suffered an adverse employment action; and 4) the adverse employment action occurred under circumstances giving rise to an inference of retaliatory intent." Id. If plaintiff satisfies her prima facie case, the burden then shifts to defendants to rebut the presumption of discrimination by producing evidence of a legitimate, nondiscriminatory reason for the adverse employment action taken. McDonnell Douglas, 411 U.S. at 802. If defendants carry this burden of production, the presumption raised by the prima facie case is rebutted and the burden shifts back to plaintiff to prove that she was discriminated against. Texas Dep't of Cmty. Affairs v. Burdine, 450 U.S. 248, 255-56 (1981).

For the purposes of this pending motion, defendants concede that plaintiff has established that she exercised her rights protected under the FMLA, and she was qualified for her position. (Dkt. #26, at 16; see also Dkt. #29, at 5-6). Defendants dispute, however, that plaintiff suffered an adverse employment action. (Dkt. #26, at 16-20).

"A plaintiff sustains an adverse employment action if he or she endures a 'materially adverse change' in the terms and conditions of employment," which "might be indicated by a termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices . . . unique to a particular situation." Galabya v. New York City Bd. of Educ., 202 F.3d 636, 640 (2d Cir. 2000)(citations, internal quotations & footnote omitted). A "materially adverse change" in working conditions is more than a "mere inconvenience or an alteration of job responsibilities," id. (citation omitted), and "normally petty slights, minor annoyances, and simple lack of good manners in the workplace fall short of this standard." Sacco v. Legg Mason Inv. Counsel & Trust Co., N.A., 660 F. Supp. 2d 302,

313 (D. Conn. 2009)(citations & internal quotations omitted).  See also Miller v. Praxair, Inc., No. 09-2962-CV, at 4 (2d Cir. Nov. 24, 2010)(aside from a voluntary resignation, no adverse employment action is identified and as such, a claim for unlawful retaliation cannot be established).

Plaintiff contends that in retaliation for taking leave in February 2008, she was mistreated immediately when she returned to work, and as a result of the conduct of defendants, plaintiff needed to take a second medical leave in October 2008 which then culminated in her termination of employment at Project APOYO.  (Dkt. #29, at 6-8). Specifically, in her complaint, plaintiff alleges that after she returned to work in February 2008, "in a pattern of gross abuse, . . .  defendants Freimuth and Malave-Ortiz retaliated against . . .  plaintiff by engaging in behaviors which they knew, in the light of . . .  plaintiff's known fragile emotional state, and intended [sic] would cause . . . plaintiff to suffer a relapse into her clinical depression."[13]  (Complaint ¶ 14).  In her complaint, plaintiff points to two specific instances of this alleged abuse: on October 6, 2008, defendant Malave-Ortiz sent plaintiff a letter stating that a "serious allegation has been made against you concerning behavior that was both inappropriate and unprofessional," and on October 14, 2008, defendant Freimuth "falsely and maliciously accused . . . plaintiff of violating Article 5 of the Employee Handbook and issued her a formal 'warning' despite knowing that . . . plaintiff had not violated the handbook's provisions."  (Complaint ¶¶ 15-16).

### 1. OCTOBER 14, 2008 LETTER

On May 20, 2008, Lois Nesci, the Chief of Operations of Catholic Charities, issued a

---

[13]Plaintiff admits that she never told defendants that she needed an accommodation when she returned from her first leave, and she told them that she was able to return to her full duties on a full-time basis "[a]fter two weeks."  (Plaintiff's 2nd Depo. at 84-85).

memorandum reminding employees of the Health Certification requirements outlined in Article 5 of the policy and licensing requirements of defendant Catholic Charities. (Malave-Ortiz Aff't ¶ 14; Nesci Aff't ¶¶ 3-4; Health Status Memo). This memorandum was addressed to all direct care staff, clinicians, social workers, group home and early childhood employees. (Health Status Memo). In the memorandum, Nesci indicated that the target date to have completed the certifications was October 1, 2008. (Malave-Ortiz Aff't ¶ 14; Nesci Aff't ¶ 5; Health Status Memo). In October 2008, central office records revealed that neither plaintiff, nor approximately thirty other employees, had provided up to date certificates, so that plaintiff and the other employees received a letter, dated October 14, 2008 that was drafted by central office, but was signed and sent out by regional directors. (Malave-Ortiz Aff't ¶ 15; Nesci Aff't ¶ 6; 10/14/08 Letter).[14]

The letter that plaintiff received by certified mail on October 23, 2008 did not constitute an adverse employment action as that letter was to "serve as a verbal warning for non compliance" with the directive issued on May 20, 2008. (10/14/08 Letter; see also Health Status Memo). As held by the Second Circuit, "oral and written warnings do not amount to materially adverse conduct." Chang v. Safe Horizons, 254 Fed. Appx. 838, 839 (2d Cir. 2007), citing Joseph v. Leavitt, 465 F.3d 87, 91 (2d Cir.2006), cert. denied, 549 U.S.

_____

[14]Plaintiff claims that she had given her health certificate to the New Haven office, not to the central office in Hartford, and she claims that as she has TB, she would test positive, and therefore was exempt from the TB testing requirement, a fact which plaintiff claims that the central office knew. (Plaintiff's 2nd Depo. at 86-90). Plaintiff did not inform her employer of this when she received the October 14, 2008 letter. (Malave-Ortiz Aff't ¶ 16).

Catholic Charities has a few employees who are TB positive, and such employees remind Catholic Charities of that fact and simply provide an updated health certificate. (Malave-Ortiz Aff't ¶ 16). Catholic Charities does not record such information and has no intention, for reasons of confidentiality and privacy, of creating such a list. (Id.).

1282 (2007)("The application of the [employer's] disciplinary policies to [the employee], without more, does not constitute adverse employment action.").   As in <u>Chang</u>, because defendants issued a warning to plaintiff consistent with the "first phase of the progressive disciplinary process" (10/14/08 Letter), plaintiff did not suffer a materially adverse action. <u>Chang</u>, 254 Fed. Appx. at 839.  Additionally, the October 14, 2008 letter was a uniform letter sent to approximately thirty other employees; plaintiff was not singled out to receive this letter in retaliation for taking FMLA leave.  Further, as stated above, defendants, who needed to comply with governing policy and licensing requirements, have demonstrated a legitimate, non-discriminatory reason for sending the letters.[15]

### 2. OCTOBER 6, 2008 LETTER

On September 29, 2008, a second employee, Rebecca Nazario, filed a grievance in which she claimed that she was being unfairly treated and criticized by plaintiff.  (Nazario Letter).   Nazario's claims were treated seriously, and as with the first grievance,[16] Malave-Ortiz sent plaintiff a letter, dated October 6, 2008, informing her that a grievance had been

---

[15] <u>See</u> note 18 <u>infra.</u>

[16] As discussed above, prior to plaintiff's first FMLA leave, Traci Crissman, a clinician at Project APOYO, wrote to Mark Augustine, the Director of Clinical Services, complaining about "incidents of inner-office hazing and unprofessional conduct which transpired at Catholic Charities Project APOYO" at plaintiff's direction.  (Malave-Ortiz Aff't ¶ 5; Crissman Grievance Letter). Crissman complained that three other employees "following [plaintiff's] directives, actively participated or developed new ways of treating me in ways in which I would consider malevolent and unprofessional."  (Malave-Ortiz Aff't ¶ 7).  After the complaint was received, Malave-Ortiz initiated an investigation and on July 31, 2007, sent plaintiff a letter informing her that an allegation had been made against her, an investigation would be conducted, and that she was to cease and desist from any type of behavior that could be considered inappropriate, unprofessional or retaliatory.  (Malave-Ortiz Aff't ¶ 8; 7/31/07 Letter).  At that time, defendant Catholic Charities did not provide plaintiff with the details or names of the persons involved.  (Malave-Ortiz Aff't ¶ 9). That same day, plaintiff was interviewed, during which she was given details and an opportunity to provide a written statement, which she did. (Malave-Ortiz Aff't ¶ 10; Plaintiff's 7/31/07 Statement). Ultimately, after the investigation, it was determined that there was a pattern of unacceptable conduct, and in October, plaintiff was given a one day suspension.  (Malave-Ortiz Aff't ¶ 11; Hawley Letter).  A little over a week later, plaintiff went out on leave.  (Plaintiff's Depo. at 63).

filed, and that she was to cease and desist from any type of behavior that could be considered inappropriate, unprofessional, or retaliatory.  (Malave-Ortiz Aff't ¶ 21; 10/6/08 Letter).[17]  Before she could be interviewed, plaintiff went out on her second FMLA leave. (Malave-Ortiz Aff't ¶ 21).

This was the only significant contact Malave-Ortiz had with plaintiff in the several months before plaintiff went out on her second FMLA leave (Malave-Ortiz Aff't ¶ 22), and plaintiff admitted at her deposition that Malave-Ortiz took no action towards plaintiff between her first and second FMLA leaves that she considered abusive.  (Plaintiff's 2nd Depo. at 74, 76)("Q. [by defense counsel] What direct actions did she take towards you that you consider abusive?  A. [by plaintiff] She didn't take any.").  Additionally, the letter that plaintiff received on or about  October 8, 2008 was exactly the same form letter that she received on or about July 31, 2007 after the first grievance was made.  (Compare 7/31/07 Letter with 10/6/08 Letter).   The October 6, 2008 letter does not constitute an adverse action as plaintiff was not terminated or demoted, nor did her title, benefits, or material responsibilities change.  See Galabya, 202 F.3d at 640.  Defendants are correct that plaintiff is not immune from the "normal constraints and procedures of employment merely because [she]  has filed an FMLA

_____

[17]Contrary to plaintiff's contention that there was "no merit to the allegations" arising out of the "grievances and warnings" directed at plaintiff, defendants concluded, after an investigation, that plaintiff engaged in a pattern of unacceptable conduct and she was given a one day suspension; plaintiff went out on her second leave before the conclusion of the investigation into the merit of the second grievance.  Further, while plaintiff contends that there was no merit to the second grievance, she also asserts that interviews of her colleagues in connection with the investigation into to the second grievance constitute abuse and harassment. (See Dkt. #33, at 4).

The warning, as discussed above, was issued after plaintiff's health certifications were not received by defendants.  As articulated above, the warning was not issued on baseless grounds.

claim." (Dkt. #26, at 18).[18]

### 3. ALLEGATIONS RELATING TO PATTERN OF GROSS ABUSE

At the time of plaintiff's first leave, and thereafter, her immediate supervisor was Wally Garcia, and his supervisor was Robin Hawley, who was Director of Programs for the New Haven Region. (Malave-Ortiz Aff't ¶ 17). While plaintiff was on leave, Hawley was promoted, and Freimuth was hired as the new director of programs for the Region. (Id.). Plaintiff contends that upon her return from her medical leave, defendant Freimuth, who became the area manager while plaintiff was out on leave, said "[e]verything is going to change. Whoever is here, . . .; whoever does not like the job, whoever was absent, whoever left before because of stress or so, I don't care. We will change things here." (Plaintiff's Depo. at 82; Zumaeta Aff't ¶ 5). In support of plaintiff's contention, Eduardo Zumaeta, who was employed as a program clinician at Project APOYO from April 2008 to May 2009, avers that he "heard [defendant] Freimuth . . . state numerous times that everything was going to change[,] and she didn't care about whoever left before because of stress. These

---

[18]Furthermore, even assuming arguendo that either letter that plaintiff received in October 2008 was done in retaliation for plaintiff having taken FMLA leave, which plaintiff has not established, plaintiff also cannot establish a causal connection between her protected activity and the alleged retaliatory actions. Kessler v. Westchester County Dept. of Soc. Svs., 461 F.3d 199, 205-06 (2d Cir. 2006). While "[c]lose temporal proximity between the plaintiff's protected action and the employer's adverse employment action may in itself be sufficient to establish the requisite causal connection between a protected activity," Kaytor v. Electric Boat Corp., 609 F.3d 537, 552 (2d Cir. 2010)(citations omitted), "[i]n this Circuit, an inference of causation is defeated (1) if the allegedly retaliatory discharge took place at a temporal remove from the protected activity; or (2) there was an intervening causal event . . . ." Yarde v. Good Samaritan Hosp., 360 F. Supp. 2d 552, 562 (S.D.N.Y. 2005)(citation omitted). In this case, the two October letters were sent to plaintiff approximately eight months after her return to work from her first FMLA leave, which is beyond the necessary temporal proximity necessary to establish a causal connection. Id. ("Three months is on the outer edge of what courts in [the Second Circuit] recognize as sufficiently proximate to admit of an inference of causation.")(citation omitted). Cf. Woods v. Enlarged City Distr. of Newburgh, 473 F. Supp.2d 498, 529 (S.D.N.Y. 2007)(in Title VII retaliation action, five month interval "preclude[d] a finding of causal connection between the protected activity and the adverse employment action based on temporal proximity."), aff'd, 288 Fed. Appx. 757 (2d Cir. 2008).

comments were specifically directed to [plaintiff]." (Zumaeta Aff't ¶¶ 2, 5).

### a. TEMPORARY CHANGE IN WORK SCHEDULE

When plaintiff returned from leave, her work schedule changed from a Tuesday to Saturday schedule to a Monday to Friday schedule. (Malave-Ortiz Aff't ¶ 18; Nesci Aff't ¶ 7).[19] As the Project dealt with a variety of government agencies, Freimuth felt that it was important to have the site coordinator there on Monday, when officials from various government agencies could very likely be on site, versus a Saturday when it was rare for a government employee to be present. (Id.). Plaintiff testified at her deposition that she did not feel that the change in schedule was done to create more stress for her. (Plaintiff's Depo. at 64-65). Rather, plaintiff "honestly thought that [Freimuth] [did not] know the program. She [did not] know anything about the criminal justice program, so perhaps [Freimuth] want[ed plaintiff] to be there Monday through Friday when court is open for [her] to respond to any questions." (Id. at 65). When she had difficulty finding staff members to cover for staff who called out sick on Saturdays, she received her "director's okay, [and she] changed it" back to Tuesday through Saturday. (Id. at 65-66). When plaintiff was asked if Garcia or Freimuth ever told her that she could not change her schedule after she came back, she responded "No. If anything, [Garcia] was very thankful [to plaintiff for accommodating her work schedule]. . . in Project APOYO's best interest . . . ." (Id. at 67).

By plaintiff's own testimony at her deposition, she did not find the challenged action of temporarily changing her work schedule to be a materially adverse action. See Burlington Northern & Santa Fe Railway Co. v. White, 548 U.S. 53, 68 (2006)["White"](anti-retaliation

---

[19]According to plaintiff, there was an issue with having coverage on Saturdays. (Plaintiff's Depo. at 64-67).

provisions of Title VII apply when a "reasonable employee would have found the challenged action materially adverse, which in this context means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination.")(internal quotations & citations omitted). Further, "a shift change does not automatically constitute an adverse employment for retaliation purposes under <u>White</u>, but can do so only if the plaintiff shows circumstances making the shift change materially adverse to a reasonable person operating in such circumstances," <u>McCann v. Mobile County Personnel Bd.</u>, No. 5-0364-WS-B, 2006 WL 1867486, at *17 (S.D. Ala. July 6, 2006), <u>aff'd</u>, 526 F.3d 1370 (11th Cir.), <u>cert. denied</u>, 129 S. Ct. 404 (2008), which in this case, plaintiff has not established as she acknowledged that the temporary change was made for legitimate business reasons rather than to retaliate against or punish her, and when she voiced concern over the difficulties it was causing her in finding staff members who would cover for employees who called out sick on Saturdays, she was given permission to change her schedule back. Accordingly, plaintiff has not established her <u>prima facie</u> case of retaliation in the changing of her work schedule.

b. FREIMUTH'S ALLEGED BEHAVIOR

In addition to the foregoing, plaintiff elaborates that Freimuth's[20] pattern of "gross[ly] abus[ive]" behavior included Freimuth acting rude and "short," along with being "very, very dry," she was "harassing," "demanding," and "mean," and Freimuth would ask people to "tell

---

[20]Although in her complaint, plaintiff alleges that both defendants Freimuth and Malave-Ortiz retaliated against plaintiff "by engaging in behaviors which they knew, in the light of . . . plaintiff's known fragile emotional state, and intended [sic] would cause . . . plaintiff to suffer a relapse into her clinical depression (Complaint ¶ 14), as discussed above, plaintiff admitted at her deposition that defendant Malave-Ortiz took no action towards plaintiff between her first and second FMLA leaves that she considered abusive. (Plaintiff's 2nd Depo. at 74, 76)("Q. [by defense counsel] What direct actions did she take towards you that you consider abusive? A. [by plaintiff] She didn't take any.").

[her] if Carmen did something bad."  (Plaintiff's Depo. at 26, 78-79; Plaintiff's [2nd] Depo. at

16).  When plaintiff was asked how Freimuth was "mean," she responded "[l]ike, her body

language, her being very short, very rigid."  (Plaintiff's 2nd Depo. at 16).  Plaintiff claims that

Freimuth made her feel "very uncomfortable," and she did not feel supported or that

Freimuth had an "understanding of the program" or how "hectic [plaintiff's] daily routine"

was.  (Id.).  Additionally, Zumaeta avers that while plaintiff was out on her second medical

leave, Freimuth made a statement to the group that plaintiff would not be returning.

(Zumaeta Aff't ¶ 8).

As the U.S. Supreme Court has made clear, "a plaintiff must show that a reasonable

employee would have found the challenged action materially adverse . . . ."  White, 548 U.S.

at 68 (emphasis added).   The Court continued:

> We speak of material adversity because we believe it is important to
> separate significant from trivial harms. . . . An employee's decision to report
> discriminatory behavior cannot immunize that employee from those petty
> slights or minor annoyances that often take place at work and that all
> employees experience. . . . And normally petty slights, minor annoyances, and
> simple lack of good manners will not [suffice to establish material adversity].

Id. (multiple citations omitted)(emphasis in original).  The behavior of which plaintiff

complains, while perhaps rude and unsupportive, is not objectively abusive and plaintiff has

not shown that she suffered material adversity as a result of Freimuth's actions.  Plaintiff's

responses to defendants' Interrogatories reveal that she felt overworked and unsupported

by, and disengaged from, Freimuth, but they do not reveal a pattern of abusive treatment.

(Plaintiff's Response to Interr. No. 8).  Plaintiff complained that Freimuth would not attend

their Coffee Klutch, or their Annual Audit, which traditionally the Directors attended as a

symbol of support for the site coordinator; plaintiff was assigned "extensive" and "lengthy"

jobs on top of the work she was already performing; plaintiff was not notified of a Training

20

for Performance Appraisals; Freimuth did not come to plaintiff's office for the first time until July 31, 2008; Freimuth took one of the two cell phones used for the Community Service Coordinator; plaintiff was asked to make a schedule of coverage for the time she would be on vacation; plaintiff was short-staffed; and Freimuth was "demanding." (<u>Id.</u>).

Plaintiff also asserts that Freimuth harassed her by interrogating "other staff people to illicit information to use against the plaintiff." (Dkt. #33, at 4). In support of this contention, plaintiff references Zumaeta's affidavit. Zumaeta avers that after the second grievance was made, in or around the "third week of October," while he was hospitalized at Yale New Haven Hospital, defendant Freimuth came to "interrogate [him] about [plaintiff]. It was clear from her questions that she was attempting to push [plaintiff] out of the agency." (Zumaeta Aff't ¶ 6). Zumaeta claims that "Freimuth seemed disappointed that I had nothing bad to say about [plaintiff]." (<u>Id.</u>). Plaintiff also appends an affidavit from her former co-worker, Bill DeCarlo, who was supervised by plaintiff in 2006-07, who avers that "[s]ometime in the summer of 2007," he was interviewed by Human Resources at Catholic Charities regarding "an alleged hazing situation which was supposedly going on in the New Haven Project APOYO office." (DeCarlo Aff't ¶¶ 2, 7). According to DeCarlo, during the interview, he was asked by defendant Malave-Ortiz and Mark Augustine "to give information against [plaintiff]." (<u>Id.</u> ¶ 9). DeCarlo was asked "whether or not plaintiff was having private meetings with some employees where personal and private information about other employees was discussed." (<u>Id.</u>).

While Zumaeta's affidavit, standing alone, may give rise to a question most appropriately left to a jury to determine whether Freimuth's actions were taken with the intent to retaliate against plaintiff, DeCarlo's affidavit serves to clarify that even before

plaintiff ever took FMLA leave, it was the procedure of the defendants to thoroughly investigate grievances, which investigation included interviewing then-current employees. When plaintiff was notified on July 31, 2007, that a "serious allegation" had been made against her, she was informed that an investigation would take place. ( 7/31/07 Letter)("We will be investigation [sic] the allegations that have been presented to us. . . . We expect to have your full cooperation during the course of our investigation."). Additionally, plaintiff was informed of defendants' procedure in a letter dated October 18, 2007, in which she was informed of the results of investigation reached "[a]fter reviewing the verbal and written statements provided by staff . . . ." (10/18/07 Letter; <u>see also</u> "Verbal and written statements obtained during the course of our investigation confirmed that an uncomfortable working environment had been created for two employees."). Thus, Freimuth's interview of Zumaeta after the second grievance was consistent with the procedure taken prior to plaintiff's first FMLA leave so that plaintiff cannot establish that this act was taken in retaliation for plaintiff having taken leave eight months prior.[21]

## C. INTENTIONAL/NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS

In her complaint, plaintiff alleges that the conduct of defendants in retaliating against plaintiff for having exercised her rights under the FMLA statute was extreme and outrageous, was designed to force plaintiff to resign from her job by creating intolerable working conditions, and was carried out with the knowledge that it was likely to cause plaintiff to suffer "emotional distress so severe that medical care and treatment might become necessary." (Complaint ¶¶ 17-20).

In order to prevail on a claim of negligent infliction of emotional distress, "'the plaintiff

---

[21]<u>See generally</u> note 18 <u>supra</u>.

must prove that the defendant should have realized that its conduct involved an unreasonable risk of causing emotional distress and that that distress, if it were caused, might result in illness or bodily harm. . . .'" Larobina v. McDonald, 274 Conn. 394, 410 (2005), quoting Carrol v. Allstate Ins. Co., 262 Conn. 433, 446 (2003). "[T]he fear or distress experienced by the plaintiff[ ] [must] be reasonable in light of the conduct of the defendants." Larobina, 274 Conn. at 410; Carrol, 262 Conn. at 447. Further, in the employment context, a claim for negligent infliction of emotional distress "is based upon unreasonable conduct of the defendant in the termination process." Parsons v. United Techs. Corp., 243 Conn. 66, 88 (1997)(internal quotations & citation omitted). Defendants correctly contend that plaintiff cannot prevail on this claim as all of her allegations in her complaint concern defendants' actions during an ongoing employment relationship and do not address conduct occurring during the termination process which occurred in February 2009 when plaintiff did not return to work after the expiration of her second FMLA leave. (Dkt. #26, at 24-27).[22]

In order to state a claim for intentional infliction of emotional distress, plaintiff must allege:

> (1) that the [defendants] intended to inflict emotional distress or . . . knew or should have known that emotional distress was the likely result of [their] conduct; (2) that [their] conduct was extreme and outrageous; (3) that [their] conduct was the cause of the plaintiff's distress; and (4) that the emotional distress sustained by the plaintiff was severe.

Appleton v. Bd. of Educ. of the Town of Stonington, 254 Conn. 205, 210 (2000), quoting Petyan v. Ellis, 200 Conn. 243, 253 (1986)(multiple citations omitted). Additionally, the

---

[22]Plaintiff does not counter these arguments in her brief in opposition or in her surreply brief. (See Dkts. ##29, 33).

conduct of the defendants must be so "outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency and to be regarded as atrocious, and utterly intolerable in a civilized community." Carrol, 262 Conn. at 443.   It does not include conduct that is "merely insulting or displays bad manners or results in hurt feelings." Appleton, 254 Conn. at 211 (citation omitted).  Whether a defendant's conduct is extreme and outrageous is a question for the court and only where reasonable minds differ does it become a question for the jury.  Johnson v. Chesebrough-Pond's USA Co., 918 F. Supp. 543, 552 (D. Conn.) (citations omitted), aff'd mem., 104 F.3d 355 (2d Cir. 1996).

Defendants assert that plaintiff has failed to state a claim for intentional infliction of emotional distress as there is nothing in her complaint "to suggest that she was disciplined in a humiliating, extreme or outrageous manner." (Dkt. #26, at 22-23).  Plaintiff responds that "recklessness is sufficient to establish the intent element of intentional infliction of emotional distress," and defendants' conduct was in willful disregard of the likelihood that such conduct would cause plaintiff injury.  (Dkt. #29, at 10, citing Craig v. Driscoll, 262 Conn. 312, 341-43 (2003); see also Dkt. #33, at 4).  In support of this allegation, plaintiff contends that Freimuth "ordered," "demanded" and "harassed" plaintiff, all while defendants knew she was in a fragile condition.  (Dkt. #29, at 10).[23]  Specifically, plaintiff testified at her deposition that Freimuth was mean, "[l]ike her body language, her being very short, very rigid.  I felt uncomfortable with her.  Not feeling her support, her understanding of the program, how hectic was my daily routine in the program.  I mean, it was hard." (Plaintiff's

---

[23]Additionally, plaintiff asserts that "[i]mmediately upon her return[,] defendant Freimuth began to treat her differently, more harshly," (Dkt. #29, at 10), but as defendants point out, Freimuth started her employment at Project APOYO while plaintiff was out on her first leave, so that plaintiff would not have a comparison of Freimuth's behavior towards her before and after her leave.  (See Dkt. #32, at 9).

2nd Depo. at 16).   Additionally, plaintiff testified that Freimuth "never used to come to [Project ] APOYO.  She used to call me , very dry, very short, very demanding, via phone just to give me more work to do."  (Plaintiff's Depo. at 26).  This latter comment that Freimuth did not support her and did not come to Project APOYO conflicts with plaintiff's contention that Freimuth "harassed" plaintiff.

Other than identifying body language, and alleging that defendant Freimuth was "very short" and "demanding," and "ordered" and "harassed" plaintiff, plaintiff cites to no specific actions of defendants directed at her that were extreme or outrageous.  As a matter of law, absent other factors that may constitute "extreme and outrageous" conduct, "rude comments," as defendants adequately describe them, do not rise to the level of extreme and outrageous conduct.   The conduct at issue in this case does not exceed "all bounds usually tolerated by decent society . . . ." Petyan, 200 Conn. at 254, n.5 (emphasis omitted). Rather, if the conduct complained of is merely insulting or results in hurt feelings, it is insufficient to form the basis for a claim of intentional infliction of emotional distress.  See Appleton, 254 Conn. at 211 (citation & internal quotations omitted).  Accordingly, summary judgment is granted as to plaintiff's claim for intentional and/or negligent infliction of emotional distress.

## II. CONCLUSION

For the reasons stated above, defendants' Motion for Summary Judgment (Dkt. #25) is granted.

Dated this 30th day of November, 2010, at New Haven, Connecticut.

        /s/ Joan G. Margolis, USMJ
        Joan Glazer Margolis
        United States Magistrate Judge